IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Civil Action No. 07-cv-00718 - LTB - KLM

CONNIE CHAVEZ,

    Plaintiff,

v.

LANDMARK COMMUNITY NEWSPAPERS, INC., a corporation conducting business in Colorado; and
EVERGREEN NEWSPAPER GROUP, a division of Landmark Community Newspapers, Inc., conducting business in Colorado under this name,

    Defendants.

___

# ORDER
___

This case is before me on Defendants' Motion for Summary Judgment [Doc # 49]. After consideration of the motion and all related pleadings, as well as the case file, I grant the motion as set forth below.

## I. Facts

In this lawsuit, Plaintiff alleges employment discrimination based on her hearing disability, national origin, and age. The following facts are undisputed unless otherwise noted.

Defendant Landmark Community Newspapers, Inc. ("Landmark") is the owner of Defendant Evergreen Newspaper Group ("Evergreen"). Evergreen publishes several community newspapers, including one for Evergreen, Colorado.

On January 11, 2005, Defendants hired Plaintiff, who was 47 at the time, as a sales representative charged with developing accounts in her geographical area and selling advertisements in the Evergreen community newspaper. At the time she was hired, Plaintiff

advised Defendants that she had some hearing difficulties that were easily remedied by taking such steps as facing her when speaking and occasionally repeating comments. Plaintiff was hired as an at-will employee working out of her home under the direct supervision of Michelle Patrick. Plaintiff's second-level supervisor was initially Russell Puls and then John Libby.

On March 21, 2005, Ms. Patrick prepared a note to the file regarding a phone conversation she had with Plaintiff that day concerning the placement of ads. In the note, Ms. Patrick indicates that the conversation ended when Plaintiff hung up on her. Ms. Patrick contends that "most other conversations" with Plaintiff ended this same way for reasons unknown to her. Plaintiff contends that she was not hanging up on Ms. Patrick and attributes any abruptly ended calls to a disruption in her cell phone service or other calls coming in on a second line. Plaintiff further contends that she would call Ms. Patrick back when calls were abruptly ended for these reasons. Ms. Patrick's March 21, 2005 note reflects Ms. Patrick's perception that "[a]s in previous conversations, [Plaintiff] was extremely hostile and defensive" and that "[Plaintiff] is determined to do things her way only." The note also reflects Plaintiff's perception that Ms. Patrick " talk[s] down to her and [doesn't] answer her questions."

Ms. Patrick followed up on the March 21, 2005 conversation with a March 25, 2005 memorandum to Plaintiff wherein she provided "a few items of clarification" and solicited questions from Plaintiff. In the memorandum, Ms. Patrick also asked Plaintiff to advise her when she was done wrapping up some work for her former employer, a competing publication, since selling ads for it thereafter would not be "an acceptable practice." In response to a subsequent inquiry from Plaintiff, Mr. Puls confirmed that it was a violation of Defendants'

ethics code for her to be involved in selling ads for another publication. Around this same time, Ms. Patrick also proposed weekly meetings with Plaintiff so Plaintiff could update Ms. Patrick and Ms. Patrick could give Plaintiff "pats on the back." Mr. Puls approved the idea of a "weekly training meeting" and directed Ms. Patrick to hold these meetings with Plaintiff through the end of June.

On March 29, 2005, Ms. Patrick completed a performance review summary for Plaintiff on which she indicated that Plaintiff had taken on a brand new position and territory at Evergreen and was "already making great strides." In response to sections of the summary regarding opportunities for improvement; obstacles or barriers to improving performance; assistance that Mrs. Patrick would provide to her; and areas of development, Ms. Patrick responded that performance would be reviewed the following year as a result of Plaintiff's status as a new employee. Ms. Patrick also suggested that "perhaps some advanced sales training would help [Plaintiff] reach [her] high sales goals" and indicated that they would look into "training opportunities ... throughout the next year."

Sometime in late August of 2005, Mr. Puls, Plaintiff's second-level supervisor, was terminated by Defendants. A few weeks prior to his termination, Mr. Puls claims that Brad Bradberry, the manager of the Evergreen paper asked him what he was going to do about Plaintiff. When Mr. Puls responded that he didn't know what he meant and that Plaintiff performing her job satisfactorily, Mr. Puls claims that Mr. Bradberry responded that he wanted Mr. Puls to target "that fucking deaf bitch."

On September 19, 2005, Ms. Patrick sent Plaintiff a memorandum regarding her job performance. In this memorandum, Ms. Patrick advised Plaintiff that certain delineated

behaviors and practices needed "immediate and sustained improvement" in order for her to continue her employment. The memorandum also indicated that Plaintiff was not receiving formal training from Ms. Patrick at Plaintiff's request as an experienced salesperson and that Plaintiff therefore bore the responsibility of determining and requesting any training or information that she might need. At the bottom of memorandum was a place for Plaintiff's signature to indicate that she read and understood its contents and was committed to making the recommended changes to her performance in "an immediate and sustained fashion" but Plaintiff refused to sign it.

In October of 2005, Plaintiff participated in a conference call with Ms. Patrick, Kim Hogan, Defendants' human resources director, and Mr. Bradberry. Defendants contend that Plaintiff was advised that she was not permitted to tape record the call based on company policy but did so anyway without the knowledge of the other participants. Plaintiffs disputes this contention and claims that she advised Ms. Hogan at the outset of the call that she was recording it and that she did so to ensure that she did not miss anything that was said as a result of her hearing impairment. In any event, Plaintiff does not dispute that Ms. Hogan asked her during this call to provide examples of how she felt she was being treated differently because of her national origin or hearing impairment and that she did not do so at that time or any time thereafter.

Following the October conference call, Ms. Patrick sent Plaintiff a memorandum dated October 5, 2005 which identified steps that Plaintiff should take in order to be successful in her position with Evergreen and prescribed weekly meetings between Plaintiff and herself "[i]n an effort to realize these steps toward success." Ms. Patrick prepared a note to the file dated

October 14, 2005 reflecting that during her meetings with Plaintiff that week Plaintiff told her she had nothing to tell her and that she was too busy to gather information requested by Ms. Patrick. Plaintiff disputes the accuracy of this note and asserts that during their meetings that week she shared information regarding her sales, contacts, and potential sales that was not otherwise available by computer with Ms. Patrick. Apparently, differing accounts of their meetings were common, and it was therefore proposed that Ms. Hogan or another Evergreen employee also attend meetings between Plaintiff and Ms. Patrick. Plaintiff, however, was not receptive to the presence of these other parties, and the meetings were ultimately discontinued.

Mr. Libby became Evergreen's advertising director and Plaintiff's second-level supervisor on November 14, 2005. Mr. Libby was not told of any problems with Plaintiff's job performance at the time he began his employment with Defendants. This was, at least in part, because Mr. Libby did not want to hear this type of information so that he could objectively analyze every sales representative. In an early weekly sales meeting, Mr. Libby observed that Plaintiff would not participate and was not her usual self. Mr. Libby also observed that Plaintiff was "short and sarcastic" in her answers to questions from Ms. Patrick.

Around the time that Mr. Libby became Evergreen's advertising director, Ms. Patrick sent Plaintiff a note detailing changes made with respect to all sales representatives. This note also advised Plaintiff that she needed to submit a written request for any training she needed by December 1, 2005 and to have learned what she needed to know in the related areas by December 31, 2005. Plaintiff did not request any additional training.

In December of 2005, Mr. Libby met with Plaintiff and Ms. Patrick to address their differences. Mr. Libby told Plaintiff that her attitude needed to change or her employment would

5

not work out at Evergreen. Mr. Libby observed that the dynamics between Plaintiff and Ms. Patrick improved dramatically after this meeting. Mr. Libby also agreed that Plaintiff's sales improved over time and were "on schedule."

In Plaintiff's performance evaluation in February of 2006, Ms. Patrick noted that Plaintiff met her sales goals for 2005 and that her overall performance and teamwork were good. As opportunities for improvement, Ms. Patrick identified, among other things, increased training on the server; placing cold calls or planning calls with her; continuing to improve communications with the graphics department; and planning sales strategies with her.

On May 11, 2006, Ms. Patrick contends that Plaintiff turned away and refused to respond to two greetings she made to her. Plaintiff claims that she did not hear Ms. Patrick's greetings and that when she tried to explain this to her, Ms. Patrick shouted angrily "are you hard of hearing or what?" Plaintiff further claims that Ms. Patrick often made Plaintiff's hearing impairment an issue, and Mr. Puls has provided sworn testimony that Ms. Patrick made over 20 comments about it to him. Mr. Puls characterized these comments as "negative and angry."

Plaintiff met with Ms. Patrick later on May 11, 2006. At this meeting, Ms. Patrick asked Plaintiff what was going on between them. When Plaintiff expressed distaste for the tone she was using, Ms. Patrick slammed her hand on the table and told Plaintiff that she "didn't give a [shit] about the tone of [her] voice" and wanted to know what was going on.

Mr. Libby scheduled a meeting for May 15, 2006 with Plaintiff, Ms. Patrick, and Mr. Bradberry and advised them that "this kind of behavior of not speaking to people in your office and finding fault with minor objections is not acceptable in a work environment" and that things needed to "change immediately." Mr. Libby also stated that he looked forward to continuing the

"positive work environment like before the last 2 weeks." Plaintiff requested that she be able to bring an outside advisor/observer to the meeting and that it be re-scheduled. Ultimately, Plaintiff, and a former employee of Defendants with experience as a professional mediator met with Mr. Libby, Ms. Patrick, and Mr. Bradberry sometime after May 15, 2006. Before this meeting, Mr. Libby asserts that Plaintiff missed two weekly sales meetings that she was required to attend and had not done any work during that same two week period. Mr. Libby further asserts that he asked Plaintiff at the May meeting how he was supposed to run his business with her not showing up for two weeks. Plaintiff denies that Mr. Libby asked her this question or otherwise brought up the issue of her absence from the last two sales meetings of failure to perform her job in that same time period. Plaintiff further asserts that she worked every day and reported to the office several times during the weeks preceding this meeting.

Plaintiff's employment with Evergreen was terminated effective May 22, 2006. Mr. Libby made the decision to terminate Plaintiff after consulting with Ms. Hogan. In his notes, Mr. Libby set forth the following "concerns requiring termination of employment:" (1) unacceptable behavior; (2) a failure to effectively communicate with her manager that could not be resolved; and (3) a failure to timely and correctly complete paper work and reports. Nonetheless, in his deposition, Mr. Libby testified that he terminated Plaintiff's employment based solely on her failure to attend meetings and do her work in the final weeks of her employment. According to Ms. Hogan, Plaintiff was terminated for failing to complete certain paperwork; failing to attend certain meetings and work functions; being uncooperative; and having a negative attitude about her work.

Plaintiff was 48 years old at the time of her termination from employment at Evergreen.

## II.  Standard for Review

The very purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary.  *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The non-moving party has the burden of showing that there are issues of material fact to be determined.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial.  *Celotex*, 477 U.S. at 323; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992).  Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.  *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir. 1980); Fed.R.Civ.P. 56(e).  These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves."  *Celotex*, 477 U.S. at 324.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial.  *Celotex*, 477 U.S. at 323.  The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson Liberty Lobby, Inc.*, 477 U.S. at 252; *Mares*, 971 F.2d at 494.

### III. Analysis

**A. Plaintiff's Discrimination Claim Based on Disability**

Under the Americans with Disabilities Act (the "ADA"), it is unlawful to discriminate against "a qualified individual with a disability because of the disability of such individual in regard to ... terms, conditions, and privileges of employment ." 42 U.S.C. § 12112(a). A prima facie case of discrimination under the ADA requires a plaintiff to show (1) that the plaintiff is disabled within the meaning of the ADA; (2) that the plaintiff is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) that plaintiff was discriminated against because of plaintiff's disability. *Mason v. Avaya Comms., Inc.,* 357 F.3d 1114, 1117 (10th Cir. 2004). Another articulation of the final element of a prima facie case of discrimination under the ADA is that the plaintiff suffered an adverse employment action under circumstances that give rise to an inference of discrimination based on the plaintiff's disability. *Selenke v. Med. Imaging of Colorado,* 248 F.3d 1249, 1259 (10th Cir. 2001).

Defendants first argue that Plaintiff cannot make a prima facie case of discrimination under the ADA because she is not disabled. The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an

9

impairment." 42 U.S.C. § 12102(2). Plaintiff argues that she falls within this definition both because she has progressive hearing loss that substantially limits her ability to hear and because Defendants regarded her as having a hearing disability. Although Plaintiff asserted in the Final Pretrial Order that she is also impaired in the major life activities of balance and communication, she has failed to present any argument or evidence to support a finding of disability on these grounds. I will therefore only consider whether there is a triable issue regarding Plaintiff's alleged hearing disability.

Plaintiff clearly has an impairment that affects a major life activity. *See* 29 C.F.R. §1630.2(i) ("Major Life Activities means functions such as ... hearing ...."). The question is whether Plaintiff's impairment "substantially limits" her hearing. An impairment "substantially limits" a major life activity if an individual is unable to perform the major life activity as compared to the general population or is significantly restricted in the ability to do so. 29 C.F.R. §1630.2(j)(1). In determining whether Plaintiff's hearing impairment substantially limits her hearing, I consider (1) the nature and severity of Plaintiff's impairment; (2) the duration or expected duration of Plaintiff's impairment; and (3) the permanent or long term impact resulting from Plaintiff's impairment. 29 C.F.R. §1630.2(j)(2). Further, in determining whether Plaintiff has a hearing disability, I must take into account corrective measures such as hearing aids that may mitigate Plaintiff's hearing impairment. *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 475 (1999).

In support of her contention that she in fact has a hearing disability, Plaintiff cites the deposition testimony of her audiologist Gerard Capoot, M.D. Dr. Capoot testified that Plaintiff has difficulty hearing in several situations including when people are not looking directly at her

and that she would have trouble detecting "things in the environment" that the average person is able to detect or takes for granted. Plaintiff's former audiologist similarly testified that in his opinion "the amount of [hearing] loss that Plaintiff has is such that ... in many situations she would have a difficult time understanding." Dr. Capoot further testified that "[e]ven with ... hearing aids there will be circumstances that with all probability [Plainitff] will not be able to hear well." Plaintiff has provided additional evidence in her deposition testimony and affidavit that the use of hearing aids does not remedy her impairment. In view of this evidence, I conclude that there is a triable issue as to whether Plaintiff's hearing impairment substantially limits her hearing such that she is disabled under the ADA. I further conclude that the evidence of comments made by other employees of Defendants regarding Plaintiff's hearing impairment also creates a triable issue as to whether Plaintiff was disabled under the ADA because she was regarded as such.

    Defendants next argues that Plaintiff cannot make out a prima facie case of discrimination under the ADA because she cannot show that she was discriminated against because of her alleged hearing disability. In response, Plaintiff argues that she received disparate treatment because she was terminated when other sales representatives with fewer sales and worse paperwork were not. Apparently then, Plaintiff has abandoned any previous claim that she was treated differently with respect to job duties, assignments, or training, and I therefore limit my analysis to Plaintiff's termination. First, it is irrelevant if Plaintiff's sales were better than those of other sales representatives because Defendants do not cite Plaintiff's volume of sales as a factor that led to her termination. Although Defendants have to some degree cited Plaintiff's paperwork as a factor in her termination, there is a dearth of evidence to

11

support Plaintiff's assertion that she had better paperwork than other sales representatives. There is likewise no evidence in the record to support a finding that other sales representatives had any of the other problems that Defendants also cited as factors in Plaintiff's termination.

Plaintiff also seemingly argues that Mr. Bradberry's comment to Mr. Puls to target Plaintiff, "that fucking deaf bitch," for termination and Ms. Patrick's repeat comments regarding Plaintiff's hearing impairment constitute sufficient evidence of disparate treatment or circumstances giving rise to an inference of disability discrimination to survive Defendants' motion for summary judgment. The problem with this argument is that there is no evidence that either Mr. Bradberry or Ms. Patrick had any involvement in the decision to terminate Plaintiff which was undisputedly made by Mr. Libby in consultation with Ms. Hogan. Accordingly, this evidence likewise fails to establish a triable issue whether Defendants violated the ADA through disparate treatment of Plaintiff.

"Discrimination under the ADA also includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an ... employee.'" *Mason*, 357 F.3d at 1118 (*quoting* 42 U.S.C. §12112(b)(5)(A)). Although not specifically addressed in her response to Defendant's motion, it appears that Plaintiff is continuing to assert a discrimination claim under the ADA based on Ms. Patrick's alleged failure to accommodate her hearing impairment. *See* Response, p. 21 ("[Ms.] Patrick intentionally avoided the smallest of accommodations necessary for Plaintiff to hear her."). Evidence in support of this claim consists primarily of Plaintiff's sworn statements that Ms. Patrick would express annoyance at having to repeat things for Plaintiff and that Ms. Patrick would cover her mouth or not face Plaintiff when she was speaking to her. It is undisputed that

Plaintiff advised Defendants at the time of her employment that repeating comments and facing her when speaking to her may be necessary as a result of her hearing impairment. Plaintiff further asserts that she reiterated this to Ms. Patrick throughout her employment with Defendants.

Under the ADA, "reasonable accommodation" means "[m]odifications or adjustments to the work environment or to the manner or circumstances under which the position held or desired is customarily performed that enable a qualified individual to perform the *essential functions* of that job." 29 C.F.R. §1630.2(o)(1)(ii) (emphasis added). The term "essential functions" is defined as "the fundamental job duties of the employment position the individual with a disability holds or desires" and does not include "marginal functions of the position." Even assuming that Ms. Patrick failed to speak to Plaintiff in the requested manner on occasion, there is no evidence that this failure prevented Plaintiff from performing the essential functions of her job as a sales representative. To the contrary, the record is full of evidence that Plaintiff sales were satisfactory or better. I therefore conclude that Plaintiff is unable to demonstrate a triable issue regarding Defendants' alleged failure to reasonable accommodate her disability.

Since Plaintiff is unable to establish that she was discriminated against because of her alleged hearing disability or terminated under circumstances that give rise to an inference of disability discrimination, her ADA claim fails as a matter of law.

**B. Plaintiff's Discrimination Claim Based on National Origin**

A prima facie case of national origin discrimination under Title VII requires Plaintiff to show that (1) she belongs to a protected class; (2) she suffered an adverse employment action;

and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007.)

Defendants argue that Plaintiff cannot establish a prima facie case of national origin discrimination because she has presented no evidence to raise an inference of discrimination on this basis. Indeed, Plaintiff has failed to present evidence of even a single incident in which mention was made of her national origin or that of any other employee. Instead, Plaintiff states that her claim of race discrimination is "based on [Mr.] Bradberry's bias against people different than his ideal such as old people, fat people and other misogynistic description." The mere fact that Mr. Bradberry may have made derogatory comments about characteristics other than race or ethnicity does not in any way support Plaintiff's claim that she was discriminated against based on her national origin. Similarly, the fact Plaintiff was the only Hispanic employee at the Evergreen paper fails to create a triable issue with respect to this claim.

Plaintiff's argument that Defendants' failure to articulate a consistent and plausible explanation for her termination constitutes evidence of pretext may also be relevant to her prima facie case of national origin discrimination. It would be unreasonable, however, to infer from any alleged inconsistencies in the proffered reasons for Plaintiff's termination that her national origin, which was never mentioned during her employment with Defendants, was a basis for her termination.

Since Plaintiff is unable to present sufficient evidence to raise an inference of discrimination based on her national origin, her title VII claim fails as a matter of law.

### C. Plaintiff's Age Discrimination Claim

Like her claim for national origin discrimination, Plaintiff's age discrimination claim

requires her to produce evidence sufficient to create an inference that Defendants based their decision to terminate her employment on her age. *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312 (1996). To support an inference of age discrimination, Plaintiff relies first on her deposition testimony that Mr. Puls told her after he was terminated that Mr. Bradberry had instructed him not to hire old sales representatives anymore but to instead hire young sales representatives in their twenties who were in "model form." This testimony constitutes inadmissible hearsay. Its unreliability is demonstrated by the fact that Mr. Puls did not reference these alleged instructions from Mr. Bradberry in either his deposition testimony or affidavit. Plaintiff also claims Ms. Patrick made fun of another sales representative because she was in her sixties and made comments to the effect that she had been there too long. There is no evidence, however, that any adverse employment action was taken against this other employee or that Ms. Patrick had any involvement in the decision to terminate Plaintiff. Moreover, any remarks by Ms. Patrick concerning another employee's age are unrelated to Plaintiff's termination and therefore cannot create a triable issue on Plaintiff's age discrimination claim. *See Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 531 (10th Cir. 1994) ("Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions."). Finally, any alleged inconsistencies in the proffered reasons for Plaintiff's termination do not support the reasonable inference that Plaintiff's age, which was never mentioned during her employment with Defendants, was a basis for her termination.

Since Plaintiff is unable to present sufficient evidence to raise an inference of discrimination based on her age, her ADEA claim fails as a matter of law.

**D. Plaintiff's Claim for Hostile Work Environment**

"For a hostile work environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, or insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Mackenzie v. City & County of Denver,* 414 F.3d 1266, 1280 (10th Cir. 2005) (*quoting Penry v. Fed. Home Loan of Topeka,* 155 F.3d 1257, 1261 (10th Cir. 1998)). "To evaluate whether a working environment is sufficiently hostile or abusive, I consider "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *Id.* "In addition, the environment must be both subjectively and objectively hostile or abusive." *Id.*

Plaintiff devotes one short paragraph of her 30 page response brief to argument in support of her claim for hostile working environment based on her alleged hearing disability. In this paragraph, Plaintiff asserts that Ms. Patrick made frequent and pervasive comments about Plaintiff's hearing impairment; that Defendants nurtured Ms. Patrick's "hatred and instability;" and that "[b]erating an employee, frustrating her, relegating her to menial tasks, and subjecting her to increased hours and a shifting schedule justifies a finding of hostile work environment."

Turning first to Ms. Patrick comments, there is little evidence of direct comments by Ms. Patrick to Plaintiff regarding her hearing impairment. Further, although there were clearly communications issues between Ms. Patrick and Plaintiff, the nature and frequency of these issues is simply too ambiguous to support a finding that they created a hostile work environment for Plaintiff who worked primarily from home. Next, Plaintiff has failed to direct me to any

16

evidence to support a finding that Defendants nurtured or tolerated any discriminatory animus that Ms. Patrick may have had towards Plaintiff. To the contrary, Mr. Libby and Ms. Hogan undertook efforts to resolve the conflicts between Plaintiff and Ms. Patrick. Plaintiff has likewise failed to direct me to any evidence that she had to perform menial tasks, work increased hours, or work a different schedule as a result of any discriminatory animus towards her. Under these circumstances, Plaintiff has failed to establish that there is a triable issue with respect to her hostile work environment claim.

For the reasons set forth above, IT IS HEREBY ORDERED that

1. Defendants' Motion for Summary Judgment [Doc # 49] is GRANTED;

2. Plaintiffs' claims against Defendants are hereby DISMISSED WITH PREJUDICE; and

3. Final judgment shall enter in favor of Defendants; and

4. Defendants shall be awarded their costs.


Dated: October __3__, 2008 in Denver, Colorado.


                                      BY THE COURT:

                                      ___s/Lewis T. Babcock_____
                                      LEWIS T. BABCOCK, JUDGE